# 24-1250

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

STATE OF VERMONT,

*Plaintiff-Appellee,*

—against—

3M COMPANY,

*Defendant-Appellant,*

E. I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS
COMPANY, THE CHEMOURS COMPANY FC, LLC,
CORTEVA, INC., DUPONT DE NEMOURS, INC.,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

## BRIEF FOR PLAINTIFF-APPELLEE

LAURA B. MURPHY
VERMONT OFFICE OF THE
  ATTORNEY GENERAL
109 State Street
Montpelier, Vermont 05609
(802) 828-1059

MATTHEW F. PAWA
SEEGER WEISS LLP
1280 Centre Street, Suite 230
Newton Centre, Massachusetts 02459
(617) 641-9550

*Attorneys for Plaintiff-Appellee*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. iii

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT ......................................................5

STATEMENT OF THE ISSUES .........................................................6

STATEMENT OF THE CASE.............................................................6

    I.    2019: The State sues 3M. .......................................................6

    II.    2021: The State alleges PFAS injuries at the Rutland landfill. .................9

    III.    July-October 2023: 3M discloses that its Rutland facility made PFAS products that were sold "primarily" to the military and that waste from the facility was disposed of in the Rutland landfill..................................10

    IV.    November 2, 2023: The State notifies 3M that it is responsible for PFAS sent from the Rutland facility to the Rutland landfill. ...................12

    V.    January 2024: 3M removes the case.........................................................14

    VI.    The District Court's remand order.............................................................15

SUMMARY OF THE ARGUMENT ...................................................15

STANDARD OF REVIEW .................................................................19

ARGUMENT .......................................................................................19

    I.    3M's removal was untimely....................................................................19

        A. By November 2, 2023, the Rutland facility's connection to MilSpec products was ascertainable by 3M..........................................................19

            1.  The facts show that 3M could ascertain removability by November 2, 2023. ..................................................................20

            2.  3M could ascertain removability by November 2, 2023 under timeliness law. ....................................................................26

        B. The November 2 email is an "other paper" under section 1446(b)(3).....34

    II.    This case was not removable under the "federal officer" doctrine. .........36

        A. 3M has not plausibly alleged that it "acted under" a federal officer........37

ii

B. Any causal nexus between CCL MilSpec waste generated at the Rutland facility and the State's injuries is too miniscule to confer federal jurisdiction..........................................................42

CONCLUSION ........................................................................................46

iii

# TABLE OF AUTHORITIES

## Cases

*Abbo-Bradley v. City of Niagara Falls,*
    73 F.4th 143 (2d Cir. 2023) ................................................ 19

*Agyin v. Razmzan,*
    986 F.3d 168 (2d Cir. 2021) .............................................. 40

*Albritton v. A Clemente, Inc.,*
    No. 1:22-cv-00394-NLH-AMD, 2023 WL 2447422
    (D.N.J. Mar. 10, 2023) ...................................................... 45

*Badilla v. Midwest Air Traffic Control Service,*
    8 F.4th 105 (2d Cir. 2021) ................................................. 39

*Bailey v. Monsanto Co.,*
    176 F. Supp. 3d 853 (E.D. Mo. 2016) .......................... 45, 46

*Baker v. Atl. Richfield Co.,*
    962 F.3d 937 (7th Cir. 2020) ........................................ 40, 45

*New Mexico ex rel. Balderas v. Monsanto Co.,*
    454 F. Supp. 3d 1132 (D.N.M. 2020) ........................... 37, 38

*Berera v. Mesa Med. Grp., PLLC,*
    779 F.3d 352 (6th Cir. 2015) ............................................ 35

*Brown v. Amchem Prod., Inc.,*
    No. 19 CIV. 5844 (PGG), 2020 WL 1150223
    (S.D.N.Y. Mar. 10, 2020) ............................................ 26, 30

*City of Hoboken v. Chevron Corp.,*
    45 F.4th 699 (3d Cir. 2022) ..................................... 5, 18, 45

*Connecticut v. Exxon Mobil Corp.,*
    83 F.4th 122 (2d Cir. 2023) ........................ 17, 37, 39, 42, 44

*County Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.,*
    996 F.3d 243 (4th Cir. 2021) ............................................ 45

*Cutrone v. Mortgage Electronic Registration Systems,*
    749 F.3d 137 (2d Cir. 2014) ...................................... *passim*

iv

*Dahl v. R.J. Reynolds Tobacco Co.*,
  478 F.3d 965 (8th Cir. 2007) ............................................................. 35

*Dietrich v. Boeing Co.*,
  14 F.4th 1089 (9th Cir. 2021) ................................................. 31, 32, 33

*Dugdale v. Nationwide Mut. Fire Ins. Co.*,
  No. Civ. A. 4:05-CV-138, 2006 WL 335628
  (E.D. Va. Feb. 14, 2006) ..................................................................... 30

*Franchise Tax Bd. v. Construction Laborers Vacation Trust*,
  463 U.S. 1 (1983) ................................................................................ 37

*Grosch v. Tyco Fire Prod. LP*,
  No. CV-23-01259-PHX-DWL, 2023 WL 5993548
  (D. Ariz. Sept. 15, 2023) .................................................................... 39

*Hilbert v. Aeroquip, Inc.*,
  486 F. Supp. 2d 135 (D. Mass. 2007) ................................................. 42

*Isaacson v. Dow Chemical*,
  517 F.3d 129 (2d Cir. 2008) ......................................................... 40, 43

*Kelly v. Monsanto Co.*,
  No. 4:15-cv-1825 (JMB), 2016 WL 3543050
  (E.D. Mo. June 29, 2016) .................................................................... 38

*League of Women Voters v. Pennsylvania*,
  921 F.3d 378 (3d Cir. 2019) ............................................................... 35

*Levy v. A.O. Smith Water Prod. Co.*,
  No. 12 Civ 5152, 2012 WL 2878140
  (S.D.N.Y. July 13, 2012) ............................................................... 30, 33

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*,
  488 F.3d 112 (2d Cir. 2007) ............................................... 4, 17, 37, 42

*Moltner v. Starbucks Coffee Co.*,
  624 F.3d 34 (2d Cir. 2010) ................................................................. 34

*Morgan v. Great S. Dredging, Inc.*,
  Civil Action No. 11-2461, 2012 WL 4564688
  (E.D. La. Sept. 30, 2012) .................................................................... 39

*Murphy v. Air & Liquid Sys., Inc.*,
  No. 21-cv-519-DWD, 2021 WL 4169986 (S.D. Ill. Aug. 3, 2021) ....... 30

v

*New Hampshire v. 3M Co.*,
    665 F. Supp. 3d 215 (D.N.H. 2023), *appeal pending*,
    No. 23-1362 (1st Cir.) .................................................................. 32, 34

*Ohio v. Sherwin-Williams Co.*,
    No. 2:08-cv-00079, 2008 WL 4279579
    (S.D. Ohio Sept. 17, 2008) ........................................................... 38

*Orange Cnty. Water Dist. v. 3M Co.*,
    No. 21-55778, 2022 WL 605630 (9th Cir. Mar. 1, 2022) .............. 30, 31

*Papp v. Fore-Kast Sales Co.*,
    842 F.3d 805 (3d Cir. 2016) .......................................................... 40

*Pezzo v. AIR & Liquid Sys. Corp.*,
    No. 20-CV-10433, 2021 WL 2852036
    (S.D.N.Y. July 8, 2021)................................................ 4, 16, 29, 30, 33

*Railey v. Sunset Food Mart, Inc.*,
    16 F.4th 234 (7th Cir. 2021)........................................ 4, 16, 28, 29, 33

*Romulus v. CVS Pharmacy*,
    770 F.3d 67 (1st Cir. 2014) ...................................................... 32, 35

*In re Standard & Poor's Rating Agency Litig.*,
    23 F. Supp. 3d 378 (S.D.N.Y. 2014)................................................ 36

*Suttlehan v. MidFirst Bank*,
    205 F. Supp. 3d 366 (S.D.N.Y. 2016)............................................... 35

*United Food & Com. Workers Union, Loc. 919, AFL-CIO v.
    CenterMark Props. Meriden Square, Inc.*,
    30 F.3d 298 (2d Cir. 1994) ...................................................... 17, 41

*Vermont v. McGrx, Inc.*,
    No. 5:10-cv-95, 2010 WL 3767794 (D. Vt. Sept. 16, 2010) ............. 37

*Vermont v. MPHJ Tech. Invs., LLC*,
    No. 2:14-cv-192, 2015 WL 150113 (D. Vt. Jan. 12, 2015).................. 34

*Williams v. Lockheed Martin Corp.*,
    990 F.3d 852 (5th Cir. 2021) .......................................................... 40

*Wisconsin v. Amgen, Inc.*,
    516 F.3d 530 (7th Cir. 2008) .......................................................... 35

vi

## Statutes

10 V.S.A. § 6615 ........................................................ 8, 12, 13, 14

28 U.S.C. § 1442(a)(1) ............................................... 5, 14

28 U.S.C. § 1446(b) ................................................... 27, 32

28 U.S.C. § 1446(b)(3) ............................................... *passim*

28 U.S.C. § 1447(d) .................................................. 5

Class Action Fairness Act ("CAFA") ......................... 3, 27, 28, 32

## Other Authorities

2005 U.S.C.C.A.N. 3 ................................................. 32, 34

Wright & Miller, 14C Fed. Prac. & Proc. Juris. § 3731
(rev. 4th ed. 2024) ............................................... 34

U.S. Patent Database: https://ppubs.uspto.gov/pubwebapp/ ...................... 23

## INTRODUCTION

In 2019, the State of Vermont (the State) brought this lawsuit against 3M Company (3M) for PFAS contamination across Vermont—at hundreds of contaminated locations including drinking water wells, landfills, wastewater treatment facilities, and other sites.  In January 2024, after more than four years of litigation, and with a trial scheduled to begin next year, 3M removed this case to federal court.  3M says this belated removal was justified because the State never told 3M that 3M allegedly manufactured products to military specifications (MilSpec) for use by the federal government at its facility in Rutland, Vermont, which sent PFAS waste to a landfill at issue in this case.  3M says these facts give rise to "federal officer" jurisdiction and that it could have removed at any time based upon its own investigation.

3M, however, missed the statutory 30-day deadline to remove this case.  The deadline begins to run when the defendant receives a pleading, motion, order or "other paper from which it may first be ascertained that the case is" removable.  28 U.S.C. § 1446(b)(3).  Here, 3M had sufficient information to ascertain a colorable federal officer defense as a military contractor by November 2, 2023—62 days before 3M removed.  On that date, the State's litigation counsel emailed 3M's litigation counsel a letter from the Vermont Department of Environmental Conservation (DEC).  The DEC letter alleged that PFAS waste from the Rutland

1

facility had contaminated the Rutland City landfill (Rutland landfill), which was at issue in the State's lawsuit, and directed 3M to investigate releases from the facility under a statute that was (and is) a basis of one of the State's claims in this case.

This letter was prompted by the State's receipt of an amended discovery response along with a new batch of discovery documents from 3M.  These documents revealed that 3M owned a facility in Rutland in the 1970s that used PFAS to make "copper-clad laminates" (CCLs), and that 3M disposed of PFAS waste from the facility at the Rutland landfill.  The documents further stated that 3M "is a supplier" of CCLs used "extensively" in the microwave industry, which was "concentrated primarily in military markets."  3M says it could not ascertain from these documents that these microwave laminates were made for federal government use under a military specification (MilSpec).  But 3M's own patents on copper clad laminates from 1975 cite the very MilSpec on which 3M now bases its federal officer removal.  3M, in fact, is on record here as stating (as a basis for refusing to produce a corporate designee witness on its patents) that information related to its patents "is *readily available* from the patents themselves" and "more easily obtained from" the Patent and Trademark Office; and, as the district court pointed out, 3M admits that this MilSpec was publicly available.  The DEC letter emailed on November 2 thus contained enough information for 3M to "ascertain" removability under 28 U.S.C. § 1446(b)(3), which commenced the running of its

2

30-day clock to remove.  That deadline expired on December 2, 2023, but 3M waited until January 3, 2024, to remove.  This was untimely.

3M's main argument to the contrary is that this Court should ignore the information in 3M's discovery documents connecting the Rutland facility to military products made with PFAS because this knowledge was not sent back to 3M in the DEC letter emailed on November 2.  3M relies primarily on *Cutrone v. Mortgage Electronic Registration Systems*, 749 F.3d 137 (2d Cir. 2014), which held that a defendant was entitled to rely on the plaintiff's own estimation of his injuries and was not required to retrieve information in its own possession to determine whether the amount in controversy exceeded the jurisdictional threshold of the Class Action Fairness Act.  But *Cutrone* held that the removal clock is triggered when a plaintiff "alleges sufficient information for the defendant to ascertain removability" and that a defendant must apply "a reasonable amount of intelligence" to the plaintiff's disclosures.  749 F.3d at 143, 145 (quotation marks omitted).  That standard is met here.

Moreover, *Cutrone* deals with removal based on information that is within the plaintiff's control (the amount in controversy), not on an alleged federal *defense* that hinges on information within defendant's control.  Thus, when considering the timeliness of removals that, as here, are based on a federal defense, courts have held defendants are charged with knowledge of their own business and

3

that the basis of removal is "ascertainable" if the defendant knows or can readily discern the necessary information about its own operations or products. *See, e.g.*, *Railey v. Sunset Food Mart, Inc.*, 16 F.4th 234, 241 (7th Cir. 2021) (remanding because defendant "surely knows or can discern with ease" information about "its own operations," including plaintiff's union membership, for complete preemption removal). This includes whether the defendant made MilSpec products for the federal government. *Pezzo v. AIR & Liquid Sys. Corp.*, No. 20-CV-10433, 2021 WL 2852036, at *2 (S.D.N.Y. July 8, 2021) (remanding case removed under federal officer jurisdiction because defendant was expected to know which products it made and whether it made them to MilSpec). Here, 3M could easily have ascertained the basis of its removal because, a few months before the State emailed the DEC letter on November 2, 2023, 3M itself had sent the State discovery documents indicating that the Rutland facility made a product using PFAS "primarily" for military markets and was sending its waste to the Rutland landfill. When 3M waited more than 60 days to remove, it was thus untimely.

The second question (which the district court did not reach) is whether, timeliness aside, 3M's assertion of federal officer jurisdiction is valid. It is not. 3M was required to make "candid, specific and positive" allegations showing that it acted under federal guidance or control, *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 488 F.3d 112, 130 (2d Cir. 2007) (quotation marks

4

omitted)—but it has not identified a single federal contract or specified any actual sales to the federal government (or even to a government contractor). Additionally, any military products 3M made in Rutland would have contributed at most a tiny fraction of the massive, statewide contamination at issue in this lawsuit. Federal officer removal cannot be based on "so small a slice" of the total quantity of pollution at issue. *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 713 (3d Cir. 2022). Either defect in 3M's removal petition suffices to affirm the district court's decision to remand.

This case is now moving forward again in Vermont Superior Court, which has set a new trial-ready date of August 2025. The parties are engaged in expert discovery and rapidly approaching critical milestones toward trial. The State respectfully requests the Court affirm the remand order at its earliest opportunity given the importance and time-sensitivity of this matter.

## JURISDICTIONAL STATEMENT

3M removed this case to federal court alleging federal officer jurisdiction, 28 U.S.C. § 1442(a)(1). A6 ¶ 2.[1] The district court granted the State's motion to remand on April 12, 2024. SPA16. This Court has jurisdiction to review the remand order. *See* 28 U.S.C. § 1447(d).

---

[1] "A" followed by page numbers refers to relevant portions of the appendix filed by 3M. "SPA" refers to the special appendix attached to 3M's brief. "SA" followed by page numbers refers to the State's Supplemental Appendix.

## STATEMENT OF THE ISSUES

1.      Whether 3M's federal officer defense was "ascertainable" and thus started the 30-day removal clock when the State sent a letter informing 3M that PFAS from 3M's Rutland facility contaminated the Rutland landfill, and where 3M had previously produced documents disclosing that the facility used PFAS to make products primarily for military markets.

2.      Whether the defendant's obligation to provide "candid, specific and positive" information showing that it was assisting or carrying out the duties of the federal government under governmental guidance is satisfied by a barebones declaration implying that the defendant sold to federal contractors but failing to provide any information about any actual contract with or sales to the federal government.

3.      Whether the State sued 3M "because of" its alleged manufacture of a product for the federal government, where the State's lawsuit involves hundreds of contaminated locations and the alleged federal product in question at most generated a tiny fraction of waste sent to just one of those sites.

## STATEMENT OF THE CASE

### I.    2019: The State sues 3M.

The State of Vermont filed this lawsuit in June 2019 against 3M and other manufacturers of toxic per- and polyfluoroalkyl substances (PFAS).  The State seeks damages for contamination of natural resources throughout Vermont caused

by seven different PFAS chemicals, including PFOA.  A31 ¶ 1; A35 ¶¶ 12-13; A127-28 ¶¶ A-B.[2]

The State contemporaneously filed another case against 3M and other defendants for contamination caused by a specific PFAS product: aqueous film-forming foam (AFFF), used to fight fires.  The defendants removed that case in 2019 under federal officer jurisdiction on the theory that they manufactured AFFF according to military design specifications.  The State's AFFF case was promptly transferred to a federal multi-district litigation in South Carolina where it remains pending; the State has not sought to remand it.

This case is different: it seeks recovery for contamination based on defendants' manufacture of PFAS products other than AFFF, *i.e.*, hundreds of consumer and industrial products that have caused the majority of the State's PFAS contamination.  A32 ¶ 2; A35 ¶ 13; A41 ¶ 39; A43 ¶ 51; A49 ¶¶ 87-88; A54 ¶ 124; A62 ¶ 156.  In this non-AFFF case, the State expressly disclaims any relief stemming from AFFF contamination.  A35 ¶ 13.  The State filed this non-AFFF case separately because it wanted to litigate its state-law PFAS claims in its own courts.  Although 3M's brief implies that the State (like other states) somehow

---

[2] The State seeks recovery for damages caused by seven specific PFAS-chemicals, which are defined to include precursor chemicals that break down into the seven. A31-A32 ¶ 1.

7

acted improperly in filing two cases, only one of which involved AFFF, 3M's current attempt at removal has nothing to do with AFFF.

PFAS are human-made chemicals that are toxic at extremely low levels. A32 ¶ 2; A42 ¶ 46. PFAS are known as "forever chemicals" because they do not degrade. A32 ¶ 32; A41 ¶ 41. Because they do not degrade, once released they persist in the environment for long periods of time absent the use of expensive technologies to remove them. A41 ¶ 41; A42 ¶ 44. PFAS bioaccumulate in humans and are associated with a variety of negative health effects, including cancers. A42-A43 ¶¶ 45, 48.

The complaint alleges that 3M manufactured PFAS and various PFAS-containing products starting in the 1940s, marketed and sold those products nationally and in Vermont, and caused PFAS contamination at locations throughout Vermont, including at landfills. A32 ¶ 5; A33 ¶ 8; A47 ¶¶ 71, 77; A49 ¶ 88; A54 ¶ 124; A79-A81 ¶¶ 246, 247. The complaint says the lawsuit is "not limited" to the examples in the complaint, and that the State seeks compensation for injuries for non-AFFF PFAS throughout Vermont. *See, e.g.*, A79-81 ¶¶ 246-47. The State alleges 3M knew about the environmental and health risks of PFAS decades ago, but continued to sell and promote these products as safe and appropriate for widespread use. A49-A53 ¶¶ 89-115. The State pleads state common-law and statutory claims, including a claim under 10 V.S.A. § 6615, which imposes liability

8

for the costs of investigation, removal, and remedial actions on manufacturers of hazardous materials. A106-A107 ¶ 380.

## II. 2021: The State alleges PFAS injuries at the Rutland landfill.

At the beginning of fact discovery, 3M issued interrogatories asking the State to identify the sites in Vermont where the State had found PFAS contamination. Two of these interrogatories specifically asked the State to identify every location it alleges is "contaminated and injured" by PFAS, A414 (Interrogatory 18), as well as every location in Vermont where any PFAS chemical has been found in groundwater, A395 (Interrogatory 14). In February 2021, the State served supplemental interrogatory responses identifying the Rutland landfill as a site in response to both interrogatories. A402; A418. The State served 3M with updated interrogatory responses on seven occasions from August 2021 to October 2023, all of which continued to identify the Rutland landfill as a site injured by PFAS contamination and for which the State seeks recovery. A152; A163; A450; A458; A469; A477; A488; A497; A507; A515; A526; A534; A545; A553.

3M understood that the sites identified in the State's interrogatory responses were ones for which the State seeks recovery. For example, on July 15, 2022, defendants issued an organizational deposition notice to the State listing the Rutland landfill as a site where "PFAS contamination allegedly injured the State's

9

groundwater and/or drinking water."  SA-20; SA-34.  When the State identified a

30(b)(6) witness to testify on various topics, 3M and the other defendants issued a

deposition notice in March 2023 that identified the Rutland landfill as a "Site in the

State of Vermont where PFAS contamination allegedly injured the State's

groundwater and/or drinking water . . . ."  SA-8; SA-20.  In June 2023, the State's

30(b)(6) witness testified that PFAS has contaminated groundwater at the Rutland

landfill.  SA-46-SA-47.  And in July 2023, 3M filed a motion to extend the case

schedule in which it stated that the State's interrogatory responses had listed

"approximately 265 'sites' it claims have been harmed by PFAS and for which it

seeks recovery," a list that included all landfills at issue in the case.  SA-49-SA-50.

**III.    July-October 2023: 3M discloses that its Rutland facility made PFAS products that were sold "primarily" to the military and that waste from the facility was disposed of in the Rutland landfill.**

From early in the case (*i.e.*, August 2020), the State requested documents

from 3M sufficient to identify any current or historical facilities in Vermont

relating to the manufacturing, use, or storage of PFAS-containing products.  A561;

A563.  Nearly three years later, in July 2023, 3M served on the State an amended

response to this request in which 3M stated that "from 1955 to 1975 it, or one of its

affiliates, owned a manufacturing facility in Rutland, Vermont at which PFAS-

containing products may have been manufactured or otherwise used at some times"

10

and produced documents related to the facility. A563-A564; SA-110.[3] In response, the State promptly served 3M with a deposition notice seeking testimony about PFAS and PFAS-containing products manufactured at the Rutland facility, including disposal at any landfills. SA-74; SA-75-SA-76. In September 2023, 3M responded to the State's notice by refusing to produce a witness and referring the State to its document production, which it said "contain[ed] the results of its reasonable search" for information. SA-89; SA-96. On October 4, 2023, 3M supplemented its production of documents regarding the Rutland facility. SA-113. 3M produced fewer than 1,000 documents in these two document productions, of which fewer than 300 documents (totaling fewer than 3,000 pages) related to the Rutland facility. SA-110; SA-113.

The documents 3M produced in July and October 2023 established the following facts. 3M owned and operated the Rutland facility from 1955 through 1975. 3M expanded the Rutland plant in the 1970s to manufacture CCLs, "which are used extensively in the manufacture of microwave strip lines for radar antenna pulse transmissions and other applications." A566. "[U]ntil the early 1970s microwave industry output was concentrated primarily in military markets." *Id.*[4]

---

[3] 3M refers to this amended written response in its brief but mis-identifies it as an "interrogatory response." 3M Br. at 35.

[4] These products were made with TFE (which is shorthand for PTFE, *i.e.*, polytetrafluoroethylene). *See* A608 ¶ 5 (state expert declaration summarizing 3M's document production). As 3M points out, PTFE is made with PFAS, including

3M arranged for disposal of waste from the Rutland facility at the Rutland landfill, including "hazardous, flammable and toxic substances."  A580; A588; A594.

Even before 3M completed these disclosures in October 2023, 3M had admitted that information linking its CCLs to a specific military specification or "MilSpec" was "readily available."  In 1975, 3M filed two patents for products made from a copper-clad sheet.  These patents state that the sheet meets "U.S. military specification MIL-P-13949E."  SA-174; SA-187.  This is the same "MilSpec" on which 3M bases its removal.  A15-A17 ¶¶ 24-26, 28.  And in January 2022 (two years before removal), 3M refused to produce a witness in response to a corporate designee deposition notice from the State seeking information on 3M's patents.  SA-130; SA-155-SA-156.  According to 3M, the deposition notice "asks for information of the type that is *readily available* from the patents themselves" and is "more easily obtained from" the Patent and Trademark Office.  SA-156 (emphasis added).

## IV.    November 2, 2023: The State notifies 3M that it is responsible for PFAS sent from the Rutland facility to the Rutland landfill.

Based on the information in the documents disclosed by 3M, DEC sent 3M a letter dated October 23, 2023, and mailed on October 25, 2023, pursuant to the Vermont hazardous waste statute, 10 V.S.A § 6615.  DEC stated in the letter that

---

PFOA.  *See* 3M Br. at 5-6.  PFOA is one the PFAS chemicals at issue in this case.
A31 ¶ 1.

"[w]aste materials from the [Rutland] facility were transported . . . to the Rutland City Landfill, where PFAS has adversely impacted groundwater quality" and directed 3M to investigate this contamination from the facility. A598. These statements were based on the documents 3M itself had produced on or before October 4, 2023. SA-117 ¶ 5. And by this time, 3M had long known that PFAS contamination at the Rutland landfill was at issue in the case.

The State's litigation counsel in this case sent a copy of the DEC letter to 3M's litigation counsel in this case by email on November 2, 2023, with the subject line "State of Vermont v. 3M Co., et al., No. 547-6-19 Cncv / DEC letter," *i.e.*, the caption of this case. A597. On November 10, 2023, 3M's litigation counsel in this case responded to the letter and included the State's litigation counsel in this case on that correspondence. A603.

The DEC letter was not the first such letter in this case. In 2022, the state legislature amended 10 V.S.A § 6615 to provide expressly that manufacturers are liable for releases of certain hazardous materials made by the manufacturer, at which point the State sent 3M and other defendants a letter alleging their liability under the statute, and demanding that they investigate PFAS contamination at numerous PFAS sites in Vermont. SA-192-SA-209. When the defendants failed to do so, the State filed a motion to amend its complaint to add this statutory claim, an amendment the Superior Court granted in December 2022. 3M and the other

13

defendants were thus well aware of the interplay between a DEC demand letter under 10 V.S.A. § 6615 and this case.

Shortly before the State sent the DEC letter, 3M served Requests for Admission (RFAs) on the State (in September 2023), requesting that the State confirm or deny that it was seeking damages in the case for various sites, including the Rutland landfill. The State responded on December 18, 2023, confirming the position it had taken in eight prior interrogatory responses, *i.e.*, that the Rutland landfill and other sites were ones that the State alleged were contaminated and injured by PFAS. A239.

## V.    January 2024: 3M removes the case.

3M removed this case on January 3, 2024. A5; A25. 3M's removal was based on alleged federal officer jurisdiction, 28 U.S.C. § 1442(a)(1). This removal occurred shortly before an important case milestone, *i.e.*, a March 2024 fact discovery cutoff/plaintiff expert disclosure date. SA-2.

3M alleged in its Notice of Removal (NOR) that, from 1973 to 1975, it manufactured certain CCLs at the Rutland facility in accordance with U.S. MilSpec MIL-P-13949 and for use by the federal government, that this MilSpec required the use of PTFE, and that PFTE was historically manufactured with PFOA (one of the seven PFAS chemicals for which the State seeks relief in this action). A6-A7; A16; A31 ¶ 1. 3M incorrectly contended in the NOR that the State's

14

December 18, 2023, RFA responses were "the first time that the State clearly asserted" that it was seeking relief for contamination at the Rutland landfill. A11 ¶ 13. 3M argued that, in any event, it could remove at any time based upon its own investigation because the removal clock had never begun to run.

## VI.    The District Court's remand order.

The State moved to remand.  On April 12, 2024, the district court granted the motion and remanded the case.  SPA16.  The court held that the 30-day clock began to run on November 2, 2023, when the State's counsel emailed 3M the DEC letter: "Once the State provided 3M with a paper explaining that the Rutland Facility was relevant to the litigation (and both parties knew that the Facility produced products for the military), removability was reasonably ascertainable to 3M."  SPA14.

## SUMMARY OF THE ARGUMENT

3M's removal was untimely.  Under 28 U.S.C. § 1446(b)(3), a defendant has 30 days to remove after the plaintiff provides "facts explicitly establishing removability or alleges sufficient information for the defendant to ascertain removability" in an amended pleading or subsequent other paper.  *Cutrone v. Mortg. Elec. Registration Sys., Inc.*, 749 F.3d 137, 145 (2d Cir. 2014).  A defendant must "apply a reasonable amount of intelligence" when reading the plaintiff's papers.  *Id.* at 143 (internal citation omitted).

15

Removability became sufficiently ascertainable, at the latest, when the State's litigation counsel sent 3M's litigation counsel the DEC letter. This letter informed 3M that 3M had sent waste from the Rutland facility to the Rutland landfill and directed 3M to investigate releases from the facility. Years earlier, the State had informed 3M that it sought relief in this action for contamination at the landfill. A402; A418. In other words, 3M had known for a long time that the State was seeking to hold 3M liable for any PFAS it created (whether in Rutland or elsewhere) that contributed to the PFAS contamination at the Rutland landfill.

3M argues the DEC letter did not make removability ascertainable because the letter did not inform 3M that waste from the Rutland facility was generated by MilSpec products for governmental use. But when removability turns on a federal defense, defendants are held to knowledge of their own operations and products. *Railey v. Sunset Food Mart*, 16 F.4th 234, 241 (7th Cir. 2021); *Pezzo v. AIR & Liquid Sys. Corp.*, No. 20-CV-10433 (JPO), 2021 WL 2852036, at *2 (S.D.N.Y. July 8, 2021). And 3M, in fact, already had provided information to the State in discovery documents that connected the Rutland facility to military products (CCLs for microwave applications) made with PFAS. It would be absurd to insist that the State send back to 3M the very information 3M had just provided, as if the State has a duty to help 3M in making out a merits defense to the State's own claims—yet this is primarily what 3M argues. Further, 3M had previously filed

16

two patents linking CCLs to the very MilSpec on which 3M bases its removal here,
patents that 3M has admitted are "readily available" to anyone; 3M also admits that
the MilSpec itself is publicly available from an online source. 3M did not file its
NOR until two months after it received the DEC letter, by which point removal
was untimely. The district court based its remand on these findings and its
decision should be affirmed.

There are two other reasons, based on the merits of 3M's allegedly colorable
federal defense, to affirm that the district court did not reach. First, 3M's NOR
oddly fails to say that the company actually had a contract with the federal
government or that it sold MilSpec CCLs to the federal government. Instead, 3M's
NOR makes artfully worded statements that vaguely suggest the product in
question was sold in unstated quantities to an unnamed federal contractor. But 3M
was required to show that it was under the "subjection, guidance, or control" of
federal officers, *Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122, 144 (2d Cir.
2023) (quotation marks omitted), by making "candid, specific and positive"
allegations on this point, *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab.
Litig.*, 488 F.3d 112, 130 (2d Cir. 2007) (quotation marks omitted). And, when the
State challenged those allegations, 3M was required to support them by competent
proof. *United Food & Com. Workers Union, Loc. 919, AFL-CIO v. CenterMark*

17

*Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994).  It has failed to do so.

Second, 3M is required to show a "causal nexus" between 3M's tortious conduct and the waste associated with the alleged military product 3M produced in Rutland.  3M alleges it made one military product at one facility for two to three years, and the associated waste was shipped to a single landfill.  But the tortious conduct alleged in this case is vastly broader: it spans some 75 years of PFAS production by 3M, as well as a campaign of deception carried out by 3M over most of that period, all leading to contamination at more than 40 Vermont landfills and hundreds of other sites, including drinking water wells across Vermont.  Where the products associated with the federal government have helped cause only a miniscule fraction of the injuries at issue in the litigation, federal officer jurisdiction is not satisfied.  *See City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 713 (3d Cir. 2022).

That is surely the case here.  Even if 3M had shown it was producing a MilSpec product for a government contractor at a single facility for two or three years, this has no bearing on 3M's production of numerous other PFAS products that contaminated hundreds of locations in Vermont over a course of decades.  In short, there is no federal officer jurisdiction because 3M has not alleged that it had a contract with or sold CCLs to the federal government, and because there is no

18

meaningful link between the totality of 3M's tortious conduct and its alleged federal activity. Over and above the untimeliness of 3M's removal petition, these constitute independent reasons to affirm the district court and to reject 3M's assertion of federal jurisdiction.

## STANDARD OF REVIEW

This Court reviews a district court's determination of subject matter jurisdiction *de novo*. *Abbo-Bradley v. City of Niagara Falls*, 73 F.4th 143, 148 (2d Cir. 2023). "Defendants have the burden of establishing that removal is proper." *Id.* (quotation marks omitted).

## ARGUMENT

I. **3M's removal was untimely.**

    A. **By November 2, 2023, the Rutland facility's connection to MilSpec products was ascertainable by 3M.**

The removal clock is triggered when the "plaintiff provides facts explicitly establishing removability *or alleges sufficient information for the defendant to ascertain removability*." *Cutrone*, 749 F.3d at 145 (emphasis added). 3M argues it could not ascertain removability based on its alleged federal officer defense when it received the DEC letter by email on November 2, 2023. But 3M misstates both the facts and the law.

19

### 1. The facts show that 3M could ascertain removability by November 2, 2023.

On the facts, 3M spends most of its brief running away from its own discovery documents, which it produced by October 2023, and which served as the basis of the November 2, 2023 DEC letter.

3M contends the documents "did not indicate that 3M made CCLs at the Rutland facility." 3M Br. at 27. But in fact, the documents include a 3M press release announcing a "recently completed expansion of production facilities at the 3M Company Dielectric Materials & Systems division plant in Rutland, Vt.," which had "enlarged that firm's capabilities in dielectric substrates of the microwave industry." A566. The press release notes 3M "is a supplier of interconnection hardware and *copper clad laminates* to the electronics industry" and goes on to quote a 3M manager: "We're in a position now to offer a greater variety in sheet sizes and types of *'CuClad' copper coat laminates*." *Id.* (emphases added). The manager observed that 3M was projecting growth in the microwave industry and said 3M was "prepared to meet the demands that this growth will generate for '*CuClad laminates*.'" *Id.* (emphasis added).

3M also says that the discovery documents, which included disposal contracts showing 3M sent waste from the Rutland facility to the Rutland landfill via a contractor, did not "refer to waste related to CCL production." 3M Br. at 27. But that is a red herring. The disposal contracts state that the disposal contractor

20

must haul waste away from the plant five days per week to meet "3M's need for continuous effective waste disposal service," and that the waste will include "hazardous, inflammable and toxic materials."  A574; A580; A588; A591.  There was no exception for CCL waste.

Next 3M contends that "nothing" in the documents "indicated that the Rutland facility 'produced products for the military,' as the court found."  3M Br. at 35 (quoting SPA14).  But the 3M press release states that "until the early 1970s microwave industry output was concentrated primarily in military markets."  A566. And as noted above, it explicitly said that 3M's expansion of the Rutland facility "enlarged" the company's "capabilities in dielectric substrates of the microwave industry," *i.e.*, the very industry that was "concentrated primarily in military markets."  A566.[5]  In addition, 3M already had admitted in a written discovery response in September 2023 that it owned the Rutland facility only until 1975, A563, meaning that its production of CCLs at Rutland on which it bases removal

---

[5] The press release further noted that "there is expanded activity in commercial markets," a point 3M repeatedly emphasizes apparently to suggest it was not ascertainable from this document whether 3M in fact was selling to the government.  A566.  But according to this document, "commercial markets" expressly included certain governmental applications, viz., "air traffic control . . . systems."  *Id*.  And 3M says it made MilSpec for contactors serving "the federal government" generally without stating whether this was for military or civilian use. A613 ¶ 11.

occurred during the very time period (the early 1970s) that output was "concentrated in military markets."

3M further argues that the discovery documents did not expressly say the Rutland-made CCLs "were made for the military pursuant to a MilSpec" or that "the MilSpec required the use of PTFE." 3M Br. at 27. As to PTFE, the discovery documents included an organizational summary of 3M's Electrical Products Group stating that it made laminates from "TFE," as well as "Copper-clad laminates" specifically. SA-120. TFE is short for PTFE, which 3M concedes was made using PFOA, one of the PFAS at issue in this case. 3M Br. at 5-6; A608 ¶ 5.

As to the MilSpec, the "military" use was expressly flagged in the press release as we have just seen. Additionally, 3M has admitted the MilSpec could be ascertained with ease. In 2022, when the State asked 3M for a corporate designee deposition on patents for its PFAS-containing products, 3M refused on the basis that the information was "*readily available* from the patents themselves," which could be "more *easily obtained* from the Patent and Trademark Office" than from 3M. SA-130; SA-155-SA-156 (emphasis added). 3M was right about the availability of the patents: the State's online search of patents revealed that 3M filed two patents in 1975 for products made from a copper-clad sheet, and those patents stated that the sheet meets "U.S. military specification MIL-P-13949E"— the same MilSpec on which 3M bases its removal. A15-A17 ¶¶ 24-26, 28; SA-

22

174; SA-187.[6]  As the district court pointed out, the fact that "those particular products were made pursuant to a MilSpec is information that, by 3M's own admission, was publicly available."  SPA15 (citing 3M brief stating the MilSpec at issue was publicly available from an online source).  The court further noted that "3M commonly makes products pursuant to military specifications" such as those at issue in the massive AFFF multi-district litigation.  SPA15.[7]

Further, even if the law did not require 3M to understand its own products (see below), this is not a situation where removability turns on information yet to be dug up from numerous facilities and employees.  3M complains that, as "a 122-year-old multinational corporation with tens of thousands of employees and . . . facilities spread across the globe," it cannot be expected to be "omniscient" about its own products and documents.  3M Br. at 42.  But by October 2023, 3M already

---

[6] The patent database is available here https://ppubs.uspto.gov/pubwebapp/ and the patents can be found by found by searching for "strip" and "antenna" and "Minnesota Mining and Manufacturing" and "mil" (which terms are found in the 3M press release).  The search results in four documents, two of which are the patents referenced above.

[7] 3M says there are other dielectric substrates besides PTFE and "PTFE is not used in all CCLs."  3M Br. at 6 (citing MilSpec at 1.2.1.2, A302).  This statement is irrelevant because 3M removed on the very ground that the MilSpec expressly required the use of PTFE resin in CCLs for microwave applications that were supposedly made at the Rutland facility.  3M Br. at 27 ("the MilSpec required the use of PTFE").  And the MilSpec states that the two laminates suitable for a "microwave application" must be made with a "polytetrafluoroethylene resin" in the base, i.e., with PTFE.  A302 ¶ 1.2.1.1.

23

had unearthed the relatively small universe of documents on the Rutland facility and Rutland landfill and produced them in this very case.  3M very much knew what was in them: contemporaneous with the document production, 3M amended its written response to the State's document requests to reveal the facility's existence and stated that "PFAS-containing products may have been manufactured or . . . used" at the Rutland facility.  A563-64; 3M Br. at 35.

Using information from 3M's discovery documents, the State sent the DEC letter to 3M on October 25, 2023, and emailed a copy to litigation counsel on November 2, 2023.  The letter informed 3M it was responsible for PFAS contamination from the Rutland facility based upon 3M's disposal of PFAS waste at the Rutland landfill:

> The Waste Management & Prevention Division (WMPD) of the Vermont Department of Environmental Conservation (DEC) has become aware that 3M Company ("3M") owned and operated the facility located at 477 Windcrest Road in Noth Clarendon, Vermont from 1955 to 1975, during which time per-and polyfluoroalkyl substances (PFAS) containing products may have been manufactured or used.  Waste materials from the facility were transported between 1955 and 1975 up to five days per week to the Rutland City Landfill, where PFAS has adversely impacted groundwater quality and has been identified in exceedance of Vermont Groundwater Enforcement Standards.

A598.

Undeterred, 3M says the November 2 email "did not mention the Rutland facility at all," 3M Br. at 32, but this could be true only if one ignores the letter

24

attached to the email. The letter explicitly stated that 3M shipped waste to the Rutland landfill, which the State had long ago identified to 3M as a site for which the State would seek damages. A402; A418. What is more, 3M *admits* the DEC letter informed 3M that the Rutland facility was in the case: 3M now says it was "[i]n response to the DEC Letter" that 3M investigated the facility's military connection, to support removal of the case. 3M Br. at 13.[8]

In short, the record plainly shows that by November 2, 2023, 3M knew that the Rutland facility made laminates with PTFE as well as CCLs specifically, that the CCLs were made for the military to use in microwave applications, that the facility's waste was sent to the Rutland landfill, and that the State sought to hold 3M liable in this action for PFAS at the Rutland landfill. 3M has also admitted that information was "readily available" that 3M had patented CCLs made in

---

[8] It also bears mentioning that 3M's brief is inconsistent about the timing of its investigation of the Rutland facility's military connection, and in particular when it found its former Rutland employee Joseph Cesaro. As noted above, at one point 3M's brief says it "broadened its investigation" and began tracking down Mr. Cesaro in response to the DEC letter, which 3M received by November 2, 2023. 3M Br. at 13. But elsewhere 3M suggests it located Mr. Cesaro at least three months earlier, when it found the press release that 3M produced to the State in July 2023. *See* 3M Br. at 19 ("After finding an undated press release about the facility that referenced CCL, 3M located a former employee who worked there."). If 3M did discover Mr. Cesaro after locating the press release *in July or earlier*, then (even crediting 3M's theory that Mr. Cesaro was necessary to link the Rutland facility to MilSpec CCLs) it would have been aware that it manufactured MilSpec products months before 3M received the DEC letter. In ascertaining removability, 3M was not entitled to ignore any facts it received from Mr. Cesaro when reading the DEC letter.

accordance with the MilSpec at issue here that required the use of PTFE and that the MilSpec itself was publicly available online. This information allowed 3M to "ascertain" all the pertinent information 3M included in its NOR. "As several courts have concluded, the 30-day removal period is triggered when removal becomes 'ascertainable,' not when it becomes 'uncontestable.'" *See Brown v. Amchem Prod., Inc.*, No. 19 CIV. 5844 (PGG), 2020 WL 1150223, at *5 (S.D.N.Y. Mar. 10, 2020). That is the case here: 3M could have ascertained the facts supporting its attempted removal by no later than November 2, 2023.

### 2. 3M could ascertain removability by November 2, 2023 under timeliness law.

The law provides no refuge for 3M's delay. 3M had thirty days to remove after receiving an "amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C § 1446(b)(3). 3M concedes that a defendant must apply "a reasonable amount of intelligence" to the plaintiff's disclosures, *Cutrone*, 749 F.3d at 145 (quotation marks omitted), and that it cannot "bury its head in the sand." 3M Br. at 25. But that is what 3M's argument would entitle it to do.

3M seeks refuge in *Cutrone*'s statement that defendants are not required to consider "material outside of the complaint or other applicable documents for facts giving rise to removability." *Cutrone*, 749 F.3d. at 145; 3M Br. at 25, 34. However, *Cutrone* was dealing with the problem of "a plaintiff's indeterminate

26

allegations" as to the amount in controversy under the Class Action Fairness Act (CAFA). 749 F.3d. at 145. *Cutrone* joined other circuits in requiring plaintiffs to divulge information about their own damages: "We agree with these circuits and hold that, in CAFA cases, the removal clocks of 28 U.S.C. § 1446(b) are not triggered until the plaintiff serves the defendant with an initial pleading or other document that explicitly specifies the amount of monetary damages sought or sets forth facts from which an amount in controversy in excess of $5,000,000 can be ascertained." *Id*.

The amount in controversy is information within the plaintiff's control. This is the key reason for *Cutrone*'s holding and its corollary that the defendant is not required "to perform an independent investigation into a plaintiff's indeterminate allegations." *Id*. Otherwise, a plaintiff could hide the ball with vague allegations about information within its unique control while running out the clock on the defendant's right to remove. Here, however, the issue is a federal *defense* that allegedly provides a right to remove and that turns on information uniquely within the *defendant's* control. 3M's argument that the Court must ignore everything in 3M's own discovery documents because the State did not repeat the information back to 3M, 3M Br. at 33, does not make sense and would be unfair if adopted.

The case law rejects 3M's position and holds that where removal is based on a federal defense, as it is here, defendants are held to knowledge about their own

27

operations.  For example, in *Railey v. Sunset Food Mart*, 16 F.4th 234 (7th Cir. 2021), the defendant removed the case on two bases, CAFA and complete preemption by federal statutes governing claims by union employees.  The court, citing *Cutrone*, held that the CAFA removal—which turned on plaintiff's domicile—was timely because the defendant removed promptly after discovering the plaintiff's change of domicile, a matter within the plaintiff's control.  *Id.* at 239-40.  The court went on to hold that CAFA jurisdiction was defeated on other grounds, which made it necessary to address whether removal was appropriate because of the alleged "complete preemption" defense.  *Id.* at 240.  And here the court held the defendant's complete preemption removal was untimely.  *Id*. at 241.

More than thirty days before the removal, the plaintiff had disclosed the dates and locations where she worked for the defendant but did not disclose her union membership.  The court nonetheless held that the defendant could have checked its own records, which would have revealed the plaintiff's union membership more than thirty days before the defendant removed the case. Although the Seventh Circuit follows the same "bright-line rule" as in *Cutrone* (and *Cutrone*, 749 F.2d at 144-45, expressly relied on Seventh Circuit law), the court still concluded that "a defendant cannot bury its head in the sand or feign ignorance about information within its control.  If removability turns on

28

information about the defendant that the defendant itself knows or can readily
ascertain, the 30-day clock in § 1446(b)(1) begins to run." *Railey*, 16 F.4th at 241.

Similarly, in measuring the timeliness of removals (like this removal) based
on the alleged manufacture of a product for the federal government, courts
routinely hold defendants to knowledge about their own products. For example, in
*Pezzo v. AIR & Liquid Sys. Corp.*, No. 20-cv-10433 (JPO), 2021 WL 2852036
(S.D.N.Y. July 8, 2021), the plaintiff's interrogatory responses described his
asbestos exposure from "laundry equipment" on a Navy ship, but did not clearly
state that the defendant manufactured the equipment or that it did so to a MilSpec.
The court still held that these interrogatory responses started the 30-day clock. The
court drew a critical distinction between investigations aimed at filling in gaps in
the plaintiff's theory of the case on the one hand, and inquiries about whether a
defendant's own products were military products capable of supporting a federal
officer defense on the other. Thus, although *Cutrone* relieves defendants of
conducting "an independent investigation into a plaintiff's indeterminate
allegations," *id.* at *2 (quoting *Cutrone*, 749 F.3d at 145), defendants are "expected
to know the brands they control and the items they manufacture," and whether
these items are "off-the-shelf or made to specification," *id.* (brackets, citations
omitted).

*Pezzo* is not alone on this point: "numerous courts have found" that the clock starts to run on a federal officer removal even though a plaintiff has not identified the specific product or any applicable military specification, because "defendants may not ignore facts that are readily known to [them], such as the brands they control and the items they manufacture." *Murphy v. Air & Liquid Sys., Inc.*, No. 21-cv-519-DWD, 2021 WL 4169986, at *4 (S.D. Ill. Aug. 3, 2021) (30-day clock started when plaintiff said he was exposed to asbestos from various types of boiler-room equipment manufactured by defendant, but did not specify any product names or military specifications).[9]

The district court cited some of these cases in its decision, SPA6, SPA15, but 3M ignores them. In fact, 3M cites only two cases on how to measure the timeliness of a federal officer removal, and neither supports its argument. In *Orange Cnty. Water Dist. v. 3M Co.*, No. 21-55778, 2022 WL 605630 (9th Cir.

---

[9] *Accord Brown*, 2020 WL 1150223, at *4-6 (30-day clock started by plaintiff's statement that he was exposed to asbestos on "distilling plant" on naval ship, even though responses did not specify that defendant made the distilling plant or that any military specification required asbestos; "a defendant may not ignore facts that are readily known to it" (brackets and quotation marks omitted)); *Levy v. A.O. Smith Water Prod. Co.*, No. 12 Civ. 5152, 2012 WL 2878140, at *2 (S.D.N.Y. July 13, 2012) (defendant "did not require any information from plaintiff to know that [defendant] was acting under the direction of the Navy" in designing product; removal was untimely (quotation marks omitted)); *cf. Dugdale v. Nationwide Mut. Fire Ins. Co.*, No. Civ. A. 4:05-CV-138, 2006 WL 335628, at *6 (E.D. Va. Feb. 14, 2006) (remanding and noting "Nationwide is responsible for knowing that the policy number and claims number that *it assigned,* relate to a flood insurance policy" (emphasis in original)).

Mar. 1, 2022), the court held that a footnote in a reply brief did not start the 30-day clock because the footnote mentioned a contaminated site but drew no "causal connection" between the site and 3M. *Id.* at *1. The case holds that it was not 3M's job to guess whether the plaintiff believed 3M was responsible for a particular injury, but says nothing to suggest that a defendant in a federal officer case can disregard its knowledge of its own products.

3M's other federal officer case is *Dietrich v. Boeing Co.*, 14 F.4th 1089 (9th Cir. 2021), but *Dietrich* undercuts 3M's position. *Dietrich* held that the 30-day clock did not start to run when the plaintiff served her original responses to Boeing's interrogatories, because those responses implied the relevant asbestos injury was connected to her husband's time as a Boeing *employee*, and not to any exposure that occurred when her husband worked on Boeing *products* in the Marine Corps. But the court suggested the clock *did* start ticking a few months later, when the plaintiff amended her interrogatory responses to indicate her claim *was* based on asbestos exposures during military service. *Dietrich*, 14 F.4th at 1095. As the court pointed out, "no ground for removal was unequivocally clear and certain" until these amended responses were filed, because it was only then that the plaintiff "*clearly* stated" that the asbestos exposure occurred during military service. *Id.* (emphasis in original). But critically, the amended interrogatory responses did not identify any particular Boeing plane, the asbestos-

31

containing part, or any military specification requiring the use of asbestos in that part. The court nonetheless viewed the responses as sufficiently clear and unequivocal for the defendant to ascertain removability. *Id.*[10]

Finally, there are important policy reasons why courts place the burden on plaintiffs to be clear about their own damages but do not require plaintiffs to tell defendants about defendants' own products to support defendants' defense. For example, *Cutrone* emphasized that it would be unfair to require a defendant to "guess the amount of damages that the plaintiff seeks," or to "assume the costs associated with the [plaintiff's] indeterminate pleadings." *Cutrone*, 749 F.3d at 143, 144 (quotation marks omitted).[11] But the situation is different with federal defenses, where removability typically "turns on information about the defendant

---

[10] 3M repeatedly cites *Romulus v. CVS Pharmacy*, 770 F.3d 67, 74 (1st Cir. 2014), but that case does not involve a removal based on a defense; it is a CAFA case that follows the *Cutrone* analysis. A district court in the First Circuit recently held that, under *Romulus*, 3M had untimely removed a non-AFFF PFAS case by the State of New Hampshire. *See New Hampshire v. 3M Co.*, 665 F. Supp. 3d 215, 235 (D.N.H. 2023), *appeal pending*, No. 23-1362 (1st Cir.). According to the court, a filing years earlier by 3M in the state's AFFF case showed 3M's knowledge of facts relevant to its assertion of federal officer jurisdiction in the non-AFFF case—indicating that, in assessing the timeliness of federal officer removals, the plaintiff is not required to tell the defendant all over again about facts the defendant already knows. *See id.* at 235 (emphasizing 3M's duty to apply a "reasonable amount of intelligence" to plaintiff's complaint).

[11] *See also* S. Rep. No. 109–14, 9, 2005 U.S.C.C.A.N. 3, 10 (purpose of section 1446(b) is "to prevent plaintiffs from evading federal jurisdiction by hiding the true nature of their case").

that the defendant itself knows or can readily ascertain"—in *that* situation, "a burden that induces the removing party to come forward . . . is much to be desired." *Railey*, 16 F.4th at 241 (quotation marks omitted). It would be seriously unfair to require the sort of express disclosures that 3M demands from injured parties like the State. Compared to defendants like 3M, such plaintiffs will find it far more difficult (as the State's experience with 3M illustrates) to obtain discovery on all the details of the defendant's own products and operations.

It also would be unfair to require a plaintiff to use the defendant's own information about its products to lay out "explicitly . . . [and] in unequivocal terms" that the defendant has a merits defense to the plaintiff's own claims. 3M Br. at 26. As the district court pointed out, 3M's rule "would trigger the 30-day clock only when plaintiffs present defendants with a filing captioned 'this case is removable.'" SPA14. This is not the law; it is at odds with *Cutrone*'s ascertainability standard, it was rejected by the Seventh Circuit in *Railey*, and it was also rejected by *Pezzo*, *Levy*, *Dietrich*, and other cases dealing with military uses of asbestos. 3M should be held to knowledge of its own products.

By November 2, 2023, 3M knew the State's lawsuit included PFAS contamination produced by the Rutland facility, and 3M had more than enough information on its own CCLs produced at Rutland to "ascertain" the key facts in its

NOR—which means that its deadline to remove expired on December 2, 2023, more than a month before 3M removed this case on January 3, 2024.

**B.    The November 2 email is an "other paper" under section 1446(b)(3).**

3M's final argument on timeliness is that the DEC Letter transmitted by email on November 2 was not an "other paper" within the meaning of the removal statute.  3M is wrong.

First, the caselaw is clear that correspondence between counsel constitutes an "other paper" under section 1446(b)(3).  *Moltner v. Starbucks Coffee Co.*, 624 F.3d 34, 36 (2d Cir. 2010) (letter from plaintiff to defendant counted as "other paper"); *accord* Wright & Miller, 14C Fed. Prac. & Proc. Juris. § 3731 (rev. 4th ed. 2024) (other paper has "an expansive construction" and includes "correspondence between the parties and their attorneys or between the attorneys").[12]  Even the cases 3M relies on agree that "correspondence between the parties and their attorneys or between the attorneys may constitute 'other papers' under

---

[12] *Accord* S. Rep. No. 109–14, 9, 2005 U.S.C.C.A.N. 3, 10 ("the Committee favors the broad interpretation of 'other paper' adopted by some courts to include deposition transcripts, discovery responses, settlement offers and other documents or occurrences that reveal the removability of a case"); *New Hampshire*, 665 F. Supp. 3d at 231 (document "need not be formally filed"); *Vermont v. MPHJ Tech. Invs., LLC*, No. 2:14-cv-192, 2015 WL 150113, at *6 (D. Vt. Jan. 12, 2015) (the term "other paper" includes "any information received by the defendant, whether communicated in a formal or informal manner" (quotation marks omitted)).

§ 1446(b)(3)." *Berera v. Mesa Med. Grp., PLLC*, 779 F.3d 352, 365 (6th Cir. 2015) (quotation marks omitted).[13]

Second, 3M emphasizes that the paper must be "involved in" the case being removed. 3M Br. at 30. But the cases 3M cites to support this argument all discuss documents that were not exchanged between the parties, such as pleadings and judicial decisions *from other cases*.[14] 3M fails to cite a single case where correspondence between litigation counsel in the case at issue was found to be unrelated to that very case.

3M also is incorrect that the November 2 email was not "involved in" or was "independent" of this lawsuit, or to suggest that the district court made a finding to this effect:

- The email was sent by the State's counsel in this case to 3M's counsel in this case. Its subject line listed this case's caption and docket number.

- The November 2 email attached the DEC letter. This letter stated that the Rutland facility sent waste to the Rutland landfill (a site the State had already specifically and repeatedly told 3M was part of this case).

---

[13] *Accord Romulus*, 770 F.3d at 78 (other paper includes "informal correspondence from the plaintiff to the defendant"); 3M Br. at 30 (citing these cases).

[14] *See Dahl v. R.J. Reynolds Tobacco Co.*, 478 F.3d 965, 970 (8th Cir. 2007) (judicial opinion issued in "an unrelated case with completely different parties"); *League of Women Voters v. Pennsylvania*, 921 F.3d 378, 384 (3d Cir. 2019) (writ issued by the governor setting a special election); *Wisconsin v. Amgen, Inc.*, 516 F.3d 530, 533 (7th Cir. 2008) (unsealing of complaint in a separate case filed by different plaintiffs); *Suttlehan v. MidFirst Bank*, 205 F. Supp. 3d 366, 370-71 (S.D.N.Y. 2016) (summons and complaint filed by a different plaintiff).

- 3M's written response to the DEC letter was signed by its litigation counsel in this case, and it copied the State's litigation counsel in this case. A605.

- 3M reacted to the email and the attached DEC letter by taking steps to remove this case. As 3M now acknowledges, "*[i]n response to the VTDEC Letter*, 3M broadened its investigation of the Rutland facility" by identifying former employees and looking for MilSpecs for its CCLs—steps that led to the removal of this lawsuit. 3M Br. at 13 (emphasis added).

- Although 3M repeatedly suggests the district court made findings that the DEC letter was issued in an unrelated regulatory matter, 3M Br. at 2, 17, 19, what the district court actually said was that "even if the *initial* letter was mailed pursuant to an independent Vermont regulatory investigation," the email from litigation counsel flagging the docket number in this case made it very related indeed. SPA11-12.

In short, the DEC letter transmitted by email on November 2, 2023 was not "independent" of this lawsuit and 3M understood this at the time—as its own actions and briefing reveal. The letter was an "other paper" under section 1446(b)(3).

## II. This case was not removable under the "federal officer" doctrine.

3M's federal officer removal fails on the merits as well. As a threshold matter, the importance of scrutinizing removal is "at its zenith where, as here, the suit was brought by a State itself, as 'the claim of sovereign protection from removal' in such circumstances 'arises in its most powerful form.'" *In re Standard & Poor's Rating Agency Litig.*, 23 F. Supp. 3d 378, 392 (S.D.N.Y. 2014) (quoting *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012)). The Supreme Court has held that "considerations of comity make us reluctant to snatch cases

36

which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 21 n.22 (1983); *see also Vermont v. McGrx, Inc.*, No. 5:10-cv-95, 2010 WL 3767794, at *5 (D. Vt. Sept. 16, 2010) (same).  Far from getting things "backwards," 3M Br. at 50 n.2, such considerations of comity are intended to protect States from inappropriate federal officer removal, particularly in cases (like this one) where jurisdiction is asserted by private litigants.  *See New Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1139 (D.N.M. 2020) (federal officer removal "is read 'narrowly where . . . only the liability of a private company purportedly acting at the direction of a federal officer is at issue'" (internal citation omitted)).  With this principle in mind, 3M has failed to plead federal officer jurisdiction for two reasons.

### A.   3M has not plausibly alleged that it "acted under" a federal officer.

3M has not alleged it "acted under" a federal officer, *i.e.*, that 3M was under the "subjection, guidance, or control" of federal officers.  *Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122, 143 (2d Cir. 2023) (quotation marks omitted).  3M was required to make "candid, specific and positive" allegations showing that it met this standard, *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 488 F.3d 112, 130 (2d Cir. 2007) (quotation marks omitted), but 3M has not.

37

Typically, defendants allege that they had contracts with the federal government to show they are acting under a federal officer. But 3M notably has not made the simple statement that it had a contract with the federal government. Instead, 3M merely asserts that, from approximately 1973 to 1975, it manufactured CCLs "for use by" the federal government, at a time when there was a MilSpec that required these CCLs to be made with PTFE. A17 ¶¶ 28-29; 3M Br. at 50. Neither in its NOR nor in its subsequent briefing has 3M alleged that it manufactured the CCLs because it was required to do so by any contract it had with the federal government, or even that it actually sold CCLs to the federal government. In fact, the underlying declaration on which the NOR is based states that no delivery of 3M's CCLs was ever "rejected by 3M's customers or the government"—which seems to be an admission that the "government" was not one of "3M's customers." A614 ¶ 10.

And if 3M was, at most, a subcontractor to a federal contractor, then there is no federal officer jurisdiction, because a subcontract with a federal contractor does not suffice to create federal officer removal.[15] 3M says otherwise, 3M Br. at 53,

---

[15] *Ohio v. Sherwin-Williams Co.*, No. 2:08-cv-00079, 2008 WL 4279579, at *4 (S.D. Ohio Sept. 17, 2008) ("there is no authority for the proposition that a subcontractor is entitled to the government contractor defense"; remanding lawsuit against federal subcontractor); *New Mexico*, 454 F. Supp. 3d at 1145 ("Monsanto did not contract directly with the Government and was at most a subcontractor"; remanding case); *Kelly v. Monsanto Co.*, No. 4:15-cv-1825 (JMB), 2016 WL 3543050, at *9 (E.D. Mo. June 29, 2016) ("Old Monsanto sold the PCBs mostly to

but the only authority 3M cites that speaks to whether subcontractors are federal officers is *Badilla v. Midwest Air Traffic Control Service*, 8 F.4th 105 (2d Cir. 2021). If anything, *Badilla* is the exception that proves the rule because the subcontractor defendant in that case was obligated to do the work in question by the primary contract and was undoubtedly under the direct control of federal officers. *Id.* at 112 (noting that subcontractor defendant was "obligated . . . to 'provide all personnel, supervision, logistics support, and other items necessary to perform air traffic control services as defined in this statement of work'" and "reported to . . . United States Air Force officers"). As the Court pointed out, there was "no question that the senior [Air Force] officer was in charge" at the air-traffic control tower that the subcontractor defendant operated, because this officer specifically instructed the defendant that (in the officer's words) "ALL operational issues WILL BE DIRECTED to/through myself or [the other Air Force Officer] first." *Id.* at 112 (quotation marks omitted). These circumstances showed the subcontractor in *Badilla* was under the "subjection, guidance, or control" of federal officers. 3M has not made any similar allegations of direct control.[16]

---

government contractors and not to the government itself"); *Morgan v. Great S. Dredging, Inc.*, Civil Action No. 11-2461, 2012 WL 4564688, at *6 (E.D. La. Sept. 30, 2012) (defendant "cannot show that it had a contract with the government").

[16] *See also Exxon Mobil*, 83 F.4th at 144 ("the mere fact that Exxon Mobil help[s] the [g]overnment to produce an item that it needs is not enough; it must also show that . . . it acts under the close supervision, subjection, guidance, or control of federal officers" (internal quotation marks omitted)); *Grosch v. Tyco Fire Prod. LP*,

39

Similarly, none of the other cases 3M cites grounded jurisdiction in the sort of slim allegations that 3M offers here. *See* 3M Br. at 51. Unlike here, defendants in those cases had clearly established either that they were federal employees, or that they had a contract directly with the federal government. *See Agyin v. Razmzan*, 986 F.3d 168, 174, 176 (2d Cir. 2021) (defendant "acted under" a federal officer where a federal statute deemed the defendant to be a federal employee); *Williams v. Lockheed Martin Corp.*, 990 F.3d 852, 859-60 (5th Cir. 2021) (removal was proper where defendant alleged it had a "federal contract to produce" an item pursuant to detailed NASA specifications); *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (removal proper where defendant was "under contract with the United States military itself" for the product in question); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) (lawsuit was "directed at actions [defendant] took while working under a federal contract" with detailed federal specifications); *Isaacson v. Dow Chemical*, 517 F.3d 129, 137, 138 (2d Cir. 2008) (removal proper where "Defendants contracted with the Government to provide" Agent Orange; "the Government knew that Agent Orange contained dioxin, and the Government controlled the method of formulation"). 3M simply did not plausibly allege federal officer jurisdiction in its NOR.

---

No. CV-23-01259-PHX-DWL, 2023 WL 5993548, at *7 (D. Ariz. Sept. 15, 2023) (remanding PFAS case because defendant failed to meet its evidentiary burden that it was acting under a federal officer in manufacturing PFAS product).

Nor did 3M provide competent proof of jurisdiction once the State challenged 3M's NOR. *See*, *e.g.*, *United Food & Com. Workers Union, Loc. 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994) (where "allegations of jurisdictional facts are challenged . . . in any appropriate manner, the averring party must support them by competent proof" (quotation marks, brackets, and emphasis omitted)). 3M offers only a brief and vague declaration from a former employee, Joseph Cesaro, who purportedly worked at the Rutland facility from approximately 1973 to 1975. A612 ¶¶ 3-4. But Mr. Cesaro did not claim that 3M had a contract with the federal government to produce MilSpec products at the Rutland facility, or that 3M acted under the federal government's close supervision. Instead, the declaration made a series of elliptical statements: (1) the military "approved CCLs manufactured at the Rutland facility for sale to the federal government and its contractors upon qualifying the CCLs as compliant with the MilSpec"; (2) "3M's CCL customers required PTFE-containing CCLs that were certified to comply with the applicable MilSpec," and (3) "[t]hose customers included federal government contractors" purchasing CCLs for the government for microwave application. A613-A615 ¶¶ 10-11.

These carefully worded statements suggest the military may have *authorized* 3M to sell MilSpec CCLs, and some of 3M's customers may have "required" MilSpec CCLs—but they do not say that 3M made sales to the federal government,

41

that 3M had a contract with the federal government or acted under the federal government's control, or even that 3M sold MilSpec CCLs to federal contractors (which, as explained above, would not suffice to show that 3M acted under a federal officer in any case). *See, e.g.*, *Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135, 148 (D. Mass. 2007) (no colorable defense where defendant "has not supplied any of its contracts with the government and has not otherwise provided evidence showing whether it was acting as an agent of the Navy rather than an independent contractor").

In short, 3M has not made the "candid, specific and positive" allegations that it had a contract with the federal government or that it was otherwise under the "subjection, guidance, or control" of federal officers as required by this Court's *MTBE* and *Exxon Mobil* decisions. Instead, it has made artfully vague assertions that 3M was approved to make MilSpec CCLs and that some of 3M's customers were contractors who bought MilSpec CCLs from someone. Even if that someone was 3M, this would not be enough to snatch the State's five-year-old case from its own state courts.

### B. Any causal nexus between CCL MilSpec waste generated at the Rutland facility and the State's injuries is too miniscule to confer federal jurisdiction.

3M's notice of removal also fails to establish a sufficient causal nexus between its alleged conduct under the control of a federal officer and the State's

42

injuries in this case. Specifically, any waste from the Rutland facility that allegedly contained PFOA traceable to MilSpec products is, at most, a tiny piece of the State's case, which targets contamination at hundreds of sites throughout Vermont.

To sustain federal officer jurisdiction, defendants must show that "the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government." *Isaacson*, 517 F.3d at 137 (emphasis in original). The only conduct 3M has even suggested was performed under the federal government's direction was the production of CCLs at the Rutland facility over a two- or three-year period in the early 1970s. A17 ¶ 28.

But this causal nexus is too attenuated to support jurisdiction. The acts for which 3M has been sued include producing enormous volumes of PFAS chemicals for some 75 years, combined with a campaign of deception by 3M over the same period, all causing contamination across Vermont. A47-A54 ¶¶ 71-124. Not even 3M has contended that this long-lasting and extensive course of conduct as alleged by the State somehow occurred "*because of*" any federal government request for 3M to produce MilSpec CCLs at the Rutland facility over a two- to three-year period.

More specifically, although 3M has not identified how much waste its MilSpec CCLs produced, every indication is that the number is a very small fraction of the total sum of tortious conduct by 3M. For example, the Rutland

43

facility produced a wide variety of PFAS-containing products spanning two decades, A608 ¶¶ 5-6, whereas the Rutland facility produced MilSpec CCLs for only two to three years (from 1973 to 1975), A17 ¶ 28. This means that any PFAS associated with MilSpec CCLs that 3M made in Rutland must be a small portion of even just the volume of PFAS associated with the Rutland facility. And the Rutland facility would not have been the only contributor of PFAS to the Rutland landfill, which is only one of more than 40 landfills at issue in this case, and one of hundreds of other locations across Vermont where the State's natural resources are contaminated with PFAS as a result of 3M's conduct.[17]

The scope of tortious conduct gets bigger yet again when one considers that the "acts for which [3M is] being sued" include not just PFAS volumes at various sites, but also 3M's long-running campaign of deception and promotion—which is not related to any MilSpec. *See Exxon Mobil*, 83 F.4th at 145 (rejecting federal officer jurisdiction because of "total mismatch" between fossil fuel production for the government and the deceptive "marketing and public-relations campaigns"

---

[17] *See* A150-A172. In just one area near Bennington, PFAS contaminates "more than 400 drinking water wells" and other media in the area. A162 ¶ 18(a); *see also* A163-64 (41 separate landfills with contaminated groundwater, soil, or leachate); A164 ¶ i (26 contaminated wastewater treatment facilities); A164 ¶ j (listing three facilities with contamination associated with industrial wastewater); A164 ¶ m (28 locations contaminated by land application of biosolids from sewage treatment facilities); A154-58 ¶ vv (naming 86 locations with contaminated drinking water wells).

44

alleged in the complaint). In short, the acts for which 3M has been sued are immeasurably larger in scope than 3M's production of MilSpec CCLs at the Rutland facility for a few years in the early 1970s.

Courts have rejected federal officer jurisdiction where the federal defense is based on such a tiny fraction of the case. *See City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 713 (3d Cir. 2022) (crediting "estimate[] that the Department of Defense is responsible for less than 1/800th of the world's energy consumption" and rejecting federal officer removal jurisdiction based "on so small a slice of the pie"); *Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 870 (E.D. Mo. 2016) (amount of PCBs manufactured for the federal government and its contractors "is simply too small to satisfy the requirement that there be a causal connection between the conduct that was taken under federal authority and Plaintiffs' claims").[18]

---

[18] 3M's cases are not to the contrary. *See* 3M Br. at 54. In *Baker,* the court rejected a de minimis argument because the two defendants were under federal direction for 20% of the relevant period and 5 to 15% of the relevant period, respectively— whereas the number here must be far, far less than 1 percent. *Baker*, 962 F.3d at 945. *Express Scripts* does not engage in any "de minimis" analysis and even notes that the Department of Defense was one of the removing defendant's "second-largest clients." *County Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 252 (4th Cir. 2021). And the plaintiffs in *Albritton v. A Clemente, Inc.*, No. 1:22-cv-00394-NLH-AMD, 2023 WL 2447422, at *5 (D.N.J. Mar. 10, 2023), challenged whether waste from defendant's World War II operations could reasonably be tied to plaintiffs' personal injuries at all, not whether such waste was causally de minimis.

In short, the CCL waste "is simply too small to satisfy the requirement that there be a causal connection between the conduct that was taken under federal authority and Plaintiffs' claims." *See Bailey*, 176 F. Supp. 3d at 870. The brief period of any MilSpec production in Rutland cannot control the State's litigation over statewide contamination caused by some 75 years of tortious conduct, which did not occur because of the federal government. 3M's assertion of federal officer jurisdiction should be rejected on this ground alone.

## CONCLUSION

The State respectfully requests that this Court affirm the district court's remand of this action to state court.

September 27, 2024

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

Laura B. Murphy
Assistant Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3186
laura.murphy@vermont.gov

Matthew F. Pawa
Seeger Weiss LLP
1280 Centre Street, Suite 230
Newton Centre, MA 02459
(617) 641-9550

SEALED

Kyle J. McGee
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000

47

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(1) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 11,647 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f), and

(2) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word and set in Times New Roman font in a size equivalent to 14 points or larger.

September 27, 2024

Respectfully submitted,

*/s/ Matthew F. Pawa*
Matthew F. Pawa
*Counsel for Appellee State of Vermont*